| | | |
|---|---|---|
| **Shawn O'Neal,** | ) | **Civil Action No.:_____** |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **COMPLAINT** |
| | ) | |
| **PHH Mortgage Corporation d/b/a** | ) | |
| **PHH Mortgage Services,** | ) | |
| **and NewRez LLC,** | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| **Defendants.** | ) | |
| _____ | ) | |

## <u>COMPLAINT</u>

1.     This is an action brought by Plaintiff, Shawn O'Neal, for actual, statutory, and punitive damages, attorney's fees, and costs for Defendants' violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq.*, (hereinafter "FCRA"), for actual damages, treble damages, and attorney's fees and costs for Defendants' violations of the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-10, *et seq.,* (hereinafter "SCUTPA"), and for actual and statutory damages, attorney's fees, and costs for Defendants' violations of Real Estate Settlement Procedures Act, 12 U.S.C. § 2605, *et seq.*, (hereinafter "RESPA"). Plaintiff also seeks actual and punitive damages, where available, and attorneys' fees and costs, where available, for Defendants' violations of South Carolina common law.

2.     The FCRA exists to protect consumers' privacy and to impose upon those who trade in consumers' private information strict requirements to ensure that the information they report is as accurate as possible.

3.	The FCRA likewise demands that consumers' disputes of inaccurate information be taken seriously by the consumer reporting agencies, requiring that they do much more than simply pass information between themselves and furnishers of information electronically without actually investigating the substance of a consumer's dispute and consider all information available in conducting such investigations.

4.	Before the enactment of the FCRA, inaccurate and misleading information was identified as "the most serious problem in the credit reporting industry." 115 Cong. Rec. 2411 (Jan. 31, 1969). With this problem in mind, Congress enacted the FCRA "to prevent consumers from being unjustly damaged because of inaccurate or arbitrary information in a credit report." S. Rep. No. 91-517 (1969).

5.	To accomplish Congress' goals, the FCRA contains a variety of requirements to protect consumers, including §§ 1681s2-b, which is one of the cornerstone provisions of the FCRA.

6.	One of the primary purposes of the FCRA is to assure "maximum possible accuracy" of consumer information to ensure the stability of our banking system:

> The banking system is dependent upon fair and accurate credit reporting. Inaccurate credit reports directly impair the efficiency of the banking system, and unfair credit reporting methods undermine the public confidence which is essential to the continued functioning of the banking system.

*See* 15 U.S.C. § 1681(a)(1).

7.	The preservation of one's good name and reputation is also at the heart of the FCRA's purposes:

> [W]ith the trend toward computerization of billings and the

establishment of all sorts of computerized data banks, the individual is in great danger of having his life and character reduced to impersonal "blips" and key-punch holes in a stolid and unthinking machine which can literally ruin his reputation without cause, and make him unemployable or uninsurable, as well as *deny him the opportunity to obtain a mortgage or buy a home. We are not nearly as much concerned over the possible mistaken turn-down of a consumer for a luxury item as we are over the possible destruction of his good name without his knowledge and without reason. * * * [A]s Shakespeare said, the loss of one's good name is beyond price and makes one poor indeed* (emphasis added).

*Bryant v. TRW, Inc.*, 689 F.2d 72, 79 (6th Cir. 1982) [quoting 116 Cong. Rec. 36570 (1970)].

## JURISDICTION AND VENUE

8.     This Court has Jurisdiction under the Fair Credit Reporting Act ("FCRA"), 15 U.S.C. §1681p, and 28 U.S.C. §1331, §1332 and §1367.

9.     Venue is proper in the Florence Division because the Plaintiff resides in Florence County and the Defendants transacted business in this division.

## PARTIES

10.     Plaintiff, Shawn O'Neal, is a resident and citizen of the State of South Carolina, Florence County, and is over the age of twenty-one (21) years.  Plaintiff is a consumer as that term is defined by the FCRA, 15 U.S.C. §1681a(c).

11.     Defendant PHH Mortgage Corporation d/b/a PHH Mortgage Services (hereinafter "PHH") is a New Jersey corporation registered to do business in South Carolina with the South Carolina Secretary of State.  Defendant may be served with process through its registered agent for service of process, Corporation Service Co, 508 Meeting Street, West Columbia, South Carolina 29169.   At all times and in all respects relevant herein,

3

Defendant was doing business in the state of South Carolina and in this division.

12. Defendant NewRez LLC (hereinafter "NewRez"), is a Delaware company registered to do business in South Carolina with the South Carolina Secretary of State. Defendant may be served with process through its registered agent for service of process, Corporation Service Company, 508 Meeting Street, West Columbia, South Carolina 29169. At all times and in all respects relevant herein, Defendant was doing business in the state of South Carolina and in this division.

13. Defendants PHH and NewRez each acted in concert together with the other, participated in, and contributed to the damages caused to the Plaintiff.

14. All acts done by Defendant PHH were done on its own behalf and on behalf of Defendant NewRez. All acts done by Defendant NewRez were done on its own behalf and on behalf of Defendant PHH.

15. Upon information and belief, Defendant Newrez is the master servicer of Plaintiff's Mortgage and Defendant PHH is the servicer of Plaintiff's Mortgage. A subservicing agreement exists between the Defendants.

16. Defendants jointly and severally caused and contributed to the Plaintiff's damages by continuing to charge for force-placed homeowners' insurance after Plaintiff provided proof of insurance, by adding and seeking to collect improper late fees and additional escrow payments on the Mortgage, by wrongfully holding Plaintiff's payments in suspense as unapplied funds rather than applying them to the principal and interest due as required by the Mortgage contract, by failing to properly refund payments for the force-placed insurance after same should have been cancelled, by providing inaccurate and/or

4

defamatory information regarding the Plaintiff and Plaintiff's Mortgage to the credit reporting agencies and the public at large, and by failing to properly investigate Plaintiff's disputes.

## FACTUAL ALLEGATIONS

17.    Defendant NewRez is the master servicer of Plaintiff's Mortgage and Defendant PHH is the servicer of Plaintiff's Mortgage.  Plaintiff's Mortgage was originally opened August 25, 2005, and ends in account number 2318 (hereinafter "Mortgage").

18.    Plaintiff has always directly obtained hazard insurance on his home located in Hartsville, South Carolina.  Insurance on Plaintiff's home is not, and has never been, a part of Plaintiff's Mortgage escrow.

19.    Defendants wrongfully billed Plaintiff for force-placed insurance on his home and continued to add late fees and interest to cover the force-placed insurance even after admitting they had received proof of insurance obtained by Plaintiff.

20.    On or about May 17, 2022, Defendants sent Plaintiff a letter stating their records showed Plaintiff's hazard insurance for his home had expired, and because they had no evidence that Plaintiff obtained new coverage, they planned to buy insurance for Plaintiff's property, unless Plaintiff could provide proof of insurance.

21.    On May 23, 2022, Plaintiff obtained hazard insurance directly through his insurance agent, Blackwell Agency.  The insurance policy was from AEGIS General Insurance Agency/Homesite Insurance Company, Policy Number ******4449, and was valid for the policy period of 05/23/2022 – 05/23/2023.

22.    On May 23, 2022, Plaintiff sent Defendants "Evidence of Property Insurance" from

5

AEGIS confirming insurance had been obtained effective May 23, 2022.

23.    On or about June 6, 2022, Plaintiff received from his insurance agent, AEGIS/Homesite Insurance Company, an Installment Notice with a due date of June 15, 2022.

24.    On or about June 16, 2022, Defendants mailed Plaintiff a "Second and Final Notice" informing Plaintiff that he was required to provide hazard insurance information or they would buy insurance.

25.    On or about July 18, 2022, Defendants mailed Plaintiff a "Final Notice: Hazard Insurance Has Expired," which stated they intended to buy hazard insurance as they had no evidence that new coverage was obtained.

26.    On or about August 26, 2022, Plaintiff received a letter from Defendants enclosing an insurance policy obtained on his behalf because they had not received proof that he had obtained homeowner's insurance. The insurance policy was effective May 15, 2022 – May 15, 2023.  The letter stated the policy would be cancelled upon receipt of evidence of acceptable insurance coverage, and that Plaintiff would only charged for the days the policy was in force.

27.    When Plaintiff learned that Defendants had added force-placed insurance on his home, even after Plaintiff had already provided proof of insurance, Plaintiff immediately called Defendant PHH and informed it of the error.  During this call, Plaintiff spoke with the customer service department as well as the insurance department and he was assured the error would be corrected.  Plaintiff's insurance agent also forwarded proof of Plaintiff's insurance to Defendants on multiple occasions.

28.     On or about August 29, 2022, Plaintiff received an Off-Scheduled Escrow Statement from Defendants stating there was a projected shortage in the escrow account due to the addition of the force-placed insurance.  As a result, Plaintiff's monthly mortgage payment increased from $569.97 to $702.50 beginning with the October 2022 payment.

29.     On or about January 20, 2023, Plaintiff received a second Off-Scheduled Escrow Statement from Defendants showing his monthly mortgage payment was increasing from $589.58 to $702.97, beginning with the March 2023 payment.

30.     On or about March 6, 2023, Plaintiff received a letter from Assurance stating that the Lender placed insurance was scheduled to renew on May 15, 2023.

31.     Frustrated that Defendants were again renewing the force-placed insurance when Plaintiff had his own homeowner's insurance, Plaintiff again contacted Defendants to inform them that he had already had homeowner's insurance and did not need or want the lender placed insurance.

32.     On or about March 13, 2023, Plaintiff's insurance agent, Brent Blackwell of Blackwell Agency, again emailed Defendants proof of Plaintiff's homeowner's insurance through Aegis General Insurance Agency dated Effective 5/23/2022 – 5/23/2023.

33.     On or about March 16, 2023, Defendants finally sent a letter to Plaintiff confirming they had received evidence of Plaintiff's hazard insurance coverage and had updated their records to reflect it as current.  The letter stated the cancellation effective date had been adjusted to May 23, 2022. The letter also stated there would be a $30.00 coverage charge for the one-week period, 5/15/22 – 5/23/22, where Plaintiff was without coverage.

34.     On or about March 16, 2023, Plaintiff received a Confirmation of Cancellation of

the Lender-Placed Insurance from American Security Insurance Company for the named insured mortgagee, PHH Mortgage Services. This confirmation confirmed it was at the named insured's request and was effective on May 23, 2022.

35.    On or about March 16, 2023, Plaintiff also received a letter from Defendants confirming that the hazard insurance had been cancelled as of May 23, 2022, and that any unused premium charged to the mortgage or escrow account would be refunded.

36.    That same day, Plaintiff also received his monthly mortgage statement for April 1, 2023, which referenced a past due regular payment of $702.97 and included a late charge of $26.92. The statement also reflected a charge of $113.92 for force-placed hazard insurance which was wrongfully added on February 26, 2023.

37.    On or about March 17, 2023, $1,109.20 was credited to Plaintiff's escrow account.

38.    On or about March 22, 2023, Plaintiff made his mortgage payment of $619.20. Plaintiff's payment cleared his bank on March 28, 2023.

39.    On or about April 3, 2023, Plaintiff received an Off-Scheduled Escrow Statement from Defendants stating that there was a $448.25 surplus in Plaintiff's escrow account. However, because of the alleged delinquent status of Plaintiff's mortgage, Defendants were holding the surplus rather than crediting Plaintiff's principal and interest on the Mortgage. The statement also showed Plaintiff's new monthly mortgage payment would be $567.47, down from $702.97, effective June 2023. At the time Plaintiff received this Escrow Statement, his Mortgage was not delinquent.

40.    On or about April 3, 2023, Plaintiff contacted Defendant PHH and talked with "Milan" in the Escalation Department. Milan informed Plaintiff the homeowner's

insurance was actually only cancelled for a short period of time, and that Defendants were holding Plaintiff's house payment in suspense each month because it didn't fully cover the escrow balance. Plaintiff reiterated to Milan that the $448.25 currently being held by Defendants was actually due to be refunded to Plaintiff. Milan stated he would look into it. Plaintiff expressed how concerned he was about this and how important it was that it be fixed quickly so it did not impact his credit.

41.     On or about April 3, 2023, Plaintiff received a Renewal Notification from Blackwell Agency that his AEGIS/Homesite Insurance policy was set to renew on May 23, 2023, effective period 05/23/2023 – 05/23/2024.

42.     On or about April 10, 2023, Plaintiff received an "Early Intervention – Borrower Assistance" letter from Defendants stating the mortgage account was in default and due for the March 1, 2023, payment.

43.     At the time Defendants sent this Early Intervention – Borrower Assistance letter to Plaintiff, Defendants knew or should have known that Plaintiff's Mortgage payment was not in default as Plaintiff had made all of his payments to Defendants, but his payments were wrongfully being held in suspense due to Defendants ongoing failure to correct Plaintiff's escrow account.

44.     On or about April 17, 2023, Plaintiff received his monthly mortgage statement showing an amount due of $2,135.83, with $1,405.94 of that amount showing as past due, $26.92 as outstanding late charges, and $702.97 as the regular monthly payment. There was also a "Suspense Balance" of $619.20. The statement also showed an Insurance Refund of $1,109.20 on March 17, 2023. A Delinquency Notice was included with the

Statement, which stated Plaintiff's loan became delinquent on March 1, 2023, and as of April 17, 2023, Plaintiff was 47 days delinquent on his mortgage loan. The notice also showed the March 1, 2023 and April 1, 2023 payments of $702.97 were unpaid.

45.     At the time Defendants sent this Mortgage statement to Plaintiff, Defendants knew or should have known that Plaintiff's March Mortgage payment was not unpaid as Defendants had already been received the payment but had not properly credited it to the principal and interest due on Plaintiff's Mortgage.

46.     On or about April 18, 2023, Defendants sent Plaintiff a Notice of Default, which stated that as of April 18, 2023, two monthly payments were past due for a total amount due of $1,405.94, with a $26.92 late charge, and a next payment due date of March 1, 2023. The $619.20 "Suspense Balance" was deducted making the amount due to cure default $813.66.

47.     At the time Defendants sent this Notice of Default to Plaintiff, Defendants knew or should have known that Plaintiff's Mortgage payment was not in default.

48.     On or about April 21, 2023, Plaintiff made his April payment in the amount of $619.20. This payment cleared Plaintiff's checking account on April 26, 2023.

49.     On May 10, 2023, Plaintiff made his May payment in the amount of $590.00. This payment cleared Plaintiff's checking account on May 16, 2023.

50.     On or about May 15, 2023, Defendants mailed Plaintiff a monthly mortgage statement showing an amount due of $1,270.44 on June 1, 2023. This statement finally listed the correct monthly payment of $567.47, but continued to wrongfully show a past due amount of $702.97. The statement also showed the last full payment was applied to

the April 1, 2023, payment due date, and that $328.78 continued to be wrongfully held in suspense. Finally, $26.92 was added in improper late fees, despite Plaintiff's payment not being late.

51. On or about May 15, 2023, through Credit Karma, Plaintiff learned that Defendant PHH was reporting his Mortgage as 30 days late. As a result, his TransUnion credit score dropped 74 points on May 12, 2023, and his Equifax credit score dropped 120 points on May 12, 2023.

52. On or about May 18, 2023, Defendants mailed Plaintiff a letter informing him they had not received his monthly mortgage payment and that $729.89, including $26.92 in unpaid late charges, was due.

53. At the time Defendants sent the May 18, 2023 letter, Plaintiff's payment of $590.00 had already cleared his bank.

54. On or about May 19, 2023, Plaintiff received an email from Credit Karma informing him a missed payment was added to an account on his TransUnion credit report.

55. On or about May 23, 2023, Plaintiff received another email from Credit Karma notifying him a missed payment was added to his TransUnion credit report.

56. On or about June 1, 2023, Plaintiff received an Off-Scheduled Escrow Statement from Defendants informing him there was a $312.75 surplus in his escrow account, and enclosing a check in that amount to Plaintiff. The letter also informed Plaintiff his new monthly mortgage payment was returning to its original amount of $567.47 effective August 2023.

57. On or about June 2, 2023, Defendants sent Plaintiff a monthly mortgage statement

which showed Defendants failed to credit Plaintiff's payment to the principal and interest due on the Mortgage. Instead, Defendants were holding Plaintiff's previous payment as unapplied, and adding improper late charges. The Escrow account had over a $400 balance and Defendants were holding $395.54 of Plaintiff's payment in suspense.

58.     On or about June 10, 2023, Plaintiff mailed his payment to Defendants in the amount of $567.47. This check cleared Plaintiff's bank account on June 14, 2023.

59.     On or about June 21, 2023, Plaintiff received a letter from Defendants alerting him that they had not received his monthly mortgage payment, and that $53.84 had been added for late charges. At the time Defendants sent Plaintiff this letter, Plaintiff's payment had already cleared his bank and Defendants knew, or should have known, that Plaintiff's payment had already been received.

60.     On or about June 30, 2023, Plaintiff received a collection call from Defendants, phone number 1 (800) 449-8767, demanding payment. Plaintiff explained he had made all of his payments and was not late, but Defendants continued to demand additional money.

61.     On July 11, 2023, Plaintiff obtained a copy of his Trans Union credit report online. Defendant PHH was reporting Plaintiff's Mortgage as 30 days late.

62.     On or about July 11, 2023, Plaintiff mailed a written dispute letter **("First TransUnion Dispute")** to Trans Union, wherein he stated he had obtained his credit report online and found Defendant PHH was reporting his Mortgage as 30 days late. Plaintiff informed TransUnion Defendant PHH had wrongfully added force-placed insurance to his Mortgage although he was already paying for insurance directly and that the account was not late. Plaintiff provided Trans Union with his name, Social Security number, date of

birth, and address. TransUnion received Plaintiff's First Dispute on July 15, 2023, and thereafter forwarded said dispute to Defendants for investigation.

63. On or about July 11, 2023, Plaintiff mailed a written dispute letter **("First Experian Dispute")** to Experian, wherein he stated he had tried to get a copy of his Experian credit report online, but was unable to do so, and requested that Defendant send him a copy of his credit file. In his letter, Plaintiff also disputed Defendant PHH's reporting of his Mortgage as 30 days late. Specifically, Plaintiff informed Experian Defendant PHH had added force-placed insurance to his Mortgage although he was already paying for insurance directly and that the account was not late. Plaintiff provided Experian with his name, Social Security number, date of birth, and address. Experian received Plaintiff's First Dispute on July 16, 2023, and thereafter forwarded said dispute to Defendants for investigation.

64. On July 11, 2023, Plaintiff obtained a copy of his Equifax credit report which was also incorrectly reporting PHH Mortgage as 30 days late. Plaintiff mailed a written dispute letter **("First Equifax Dispute")** to Equifax, disputing the PHH Mortgage as incorrect because the account was not 30 days late. Plaintiff provided Equifax with his name, Social Security number, date of birth, and address. Thereafter, Equifax forwarded said dispute to Defendants for investigation.

65. On or about July 12, 2023, Plaintiff made his Mortgage payment to Defendants for $567.47, which cleared his bank on July 17, 2023.

66. On or about July 18, 2023, Plaintiff received a letter from Defendants alerting him that they had not received the monthly mortgage payment, and as of the date of the letter, the total amount due on the account was $648.23, with $80.76 of that amount being unpaid

late charges.  At the time Defendants mailed this letter, they knew or should have known that Plaintiff's payment had already been received on July 17, 2023.

67.     On or about July 21, 2023, Trans Union sent Plaintiff the results of its investigation into Plaintiff's dispute showing that Defendant PHH verified its reporting of the Mortgage as 30 days past due and updated the fields for Date Updated, Remarks, Maximum Delinquency, and Historical Trended Data.

68.     On or about July 21, 2023, Equifax sent Plaintiff the results of its investigation into Plaintiff's dispute.  Again, Defendant PHH verified its reporting of the Mortgage as accurate and modified the Additional Information, Terms Duration, Type of Loan and Historical Account Information Fields.

69.     On or about August 10, 2023, Plaintiff mailed his Mortgage payment to Defendants in the amount of $567.47.  Plaintiff's payment cleared his bank account on August 14, 2024.

70.     On or about August 11, 2023, Experian sent Plaintiff a copy of his Experian credit report in the mail.  Defendant PHH was still reporting Plaintiff's Mortgage as late and with a past due balance of $648.00 as of August 2023.

71.     On or about August 18, 2023, Plaintiff received a letter from Defendants alerting him his Mortgage payment had not been received, and as of the date of the letter, the total amount due on the Mortgage was $675.15, with $107.68 of that amount being unpaid late charges.

72.     At the time Defendants sent the August 18, 2023, letter to Plaintiff, Defendants knew, or should have known, that Plaintiff's August payment had already been received.

73.     On or about August 18, 2023, Plaintiff mailed a Qualified Written Request ("QWR") **(First QWR)** to Defendant PHH, wherein he stated that Defendant PHH continued to wrongfully bill him for force-placed insurance even though he has always obtained and paid for insurance himself.  Plaintiff also stated that once he learned Defendant PHH had wrongfully added insurance, he immediately called Defendant PHH and told a representative in the insurance department and the customer service department of the error, and had his insurance company forward Defendant PHH proof of his insurance.  Plaintiff stated he had been making all of his regular monthly payments, however Defendants continued to add late fees, interest, etc., to cover the force-placed insurance.  Plaintiff requested Defendant PHH correct the matter and refund him all of the charges for the force-placed insurance.  Plaintiff also requested Defendant PHH stop calling him to collect on the Mortgage because it was not past due.  Finally, Plaintiff requested Defendant PHH correct the reporting of the Mortgage to show it was not paid late in 2023, and forward him a complete payment history and accounting of the Mortgage from January 2022 through the present.

74.     Defendant PHH received Plaintiff's letter on August 24, 2023.

75.     On or about August 18, 2023, Plaintiff mailed a second dispute letter **("Second TransUnion Dispute")** to Trans Union, wherein he again disputed the PHH Mortgage account as inaccurate.  Trans Union received Plaintiff's Second Dispute letter August 24, 2023, and thereafter forwarded same to Defendant PHH.

76.     On or about August 18, 2023, Plaintiff mailed a second dispute letter **("Second Equifax Dispute")** to Equifax, wherein he disputed the PHH Mortgage account as

15

inaccurate. Equifax received Plaintiff's Second Dispute letter August 24, 2023, and thereafter forwarded same to Defendant PHH.

77.     On or about August 21, 2023, Plaintiff mailed a second dispute letter **("Second Experian Dispute")** to Experian disputing the PHH Mortgage as inaccurate. Experian received Plaintiff's Second Dispute letter August 27, 2023, and thereafter forwarded same to Defendant PHH.

78.     On or about August 28, 2023, Plaintiff received a letter from Defendants stating it had received Plaintiff's QWR dispute and would review the correspondence and provide a written response within 30 business days. However, Defendants never responded to Plaintiff's First QWR.

79.     On or about August 30, 2023, Equifax sent Plaintiff the results of its investigation into Plaintiff's dispute. Defendant PHH again verified its reporting of the Mortgage as accurate. As a result, the Mortgage continued to be inaccurately reported as 30 days late with a past due balance.

80.     On or about September 8, 2023, Plaintiff mailed Defendants his Mortgage payment of $567.47. Plaintiff's payment cleared his bank on September 13, 2023.

81.     On or about September 19, 2023, Plaintiff received a letter from Defendants stating they had not received Plaintiff's Mortgage payment and claiming that $702.07 was due, which included $134.60 in alleged unpaid late charges. At the time of this letter, Defendants knew Plaintiff's payment had already been received, but Defendants were wrongfully holding it in suspense rather than properly crediting the payments to principal and interest as required by the Mortgage.

82.    On or about September 20, 2023, Trans Union sent Plaintiff the results of its investigation into Plaintiff's dispute stating that Defendant PHH had verified their reporting of the Mortgage as accurate.  As a result, the Mortgage continued to be reported on Plaintiff's credit report as past due.

83.    On or about September 20, 2023, Experian sent Plaintiff the results of its investigation into Plaintiff's dispute.  Defendant PHH again verified their reporting of the Mortgage as accurate.  As a result, the Mortgage continued to be reported on Plaintiff's credit report with three, 30-day late payments.

84.    On or about October 6, 2023, Plaintiff mailed a third dispute letter to Trans Union **("Third TransUnion Dispute"),** wherein he again disputed the PHH Mortgage account. Specifically, Plaintiff disputed the reporting of the May and July 2023 payments as 30 days late as inaccurate.   Plaintiff stated Defendant PHH had sent him a letter admitting that the force-placed insurance added in May of 2023 was improper, and that the account should be updated to remove the late payments and show the account as current.  Upon receipt of Plaintiff's dispute, TransUnion forwarded same to Defendant PHH.

85.    On or about October 6, 2023, Plaintiff mailed a third dispute letter to Experian **("Third Experian Dispute"),** wherein he stated the PHH Mortgage account was still incorrectly reporting 30 days late for June, August, and September 2023.  Plaintiff stated that in May and June of 2023, Defendant PHH improperly added forced-placed insurance and that Defendant PHH had sent him a letter admitting the force-placed insurance they had added was improper.  As a result, the Mortgage was due to be updated to remove the late payments and show the account as current.   Upon receipt of Plaintiff's dispute,

Experian forwarded same to Defendant PHH.

86.     On or about October 6, 2023, Plaintiff mailed a third dispute letter to Equifax **("Third Equifax Dispute"),** wherein he stated the PHH Mortgage account reporting 30 days late for May and July of 2023 as inaccurate.  Plaintiff stated Defendant PHH had sent him a letter admitting the force-placed insurance they added in May of 2023 was improper, and the account should be updated to remove the late payments and show the account as current.  Upon receipt of Plaintiff's dispute, Equifax forwarded same to Defendant PHH.

87.     On or about October 6, 2023, Plaintiff mailed a second QWR to Defendant PHH **("Second QWR")**.  Plaintiff again informed Defendant PHH that it continued to wrongfully bill him for force-placed insurance, even after receipt of proof Plaintiff already had homeowner's insurance.  Plaintiff also informed Defendant that he had already told representatives in the insurance department and the customer service department of the error.  Plaintiff stated he had received Defendant PHH's March 16, 2023, letter verifying the proof of insurance Plaintiff's insurance agency sent to it was received and he would only be charged $30 to cover the one week of coverage the force-placed insurance was in effect.  Plaintiff also stated Defendant PHH had refunded him $312.75 that was part of the overpayment.  Plaintiff informed Defendant PHH that it was still wrongfully trying to collect $134.60 in late payments.  Plaintiff again stated he had been making all of his regular monthly payments, but Defendant PHH continued to add late fees, interest, etc., to cover the force-placed insurance.  Plaintiff requested Defendant PHH correct the matter and refund him all of the charges for the force-placed insurance, stop calling him to collect on the Mortgage that was not past due, and correct the reporting of the Mortgage to show

it was paid on time 2023. Plaintiff also requested Defendant provide proof it had fixed the reporting of the Mortgage on his credit and send a complete history of the escrow account, including all payments and withdrawals.

88.     Defendant PHH received Plaintiff's Second QWR on October 17, 2023, but Defendants never responded to Plaintiff's letter.

89.     On or about October 10, 2023, Plaintiff made his $567.47 payment for October, which cleared his bank on October 16, 2023.

90.     On or about November 10, 2023, Plaintiff made his $567.47 payment, which cleared his bank on November 16, 2023.

91.     On or about December 12, 2023, Plaintiff made a payment of $600.00, which cleared his bank on December 18, 2023.

92.     On or about December 18, 2023, Defendants sent a new monthly mortgage statement to Plaintiff claiming that $1,350.30 was due by January 1, 2024. As a result of Defendants' failure to properly refund the force-placed insurance premium charged to Plaintiff's escrow account, Plaintiff's payments continued to be held in suspense and misapplied, late charges continued to be added, and additional interest was charged on the balance.

93.     On or about January 10, 2024, Plaintiff made a payment of $600.00, which cleared his bank on January 17, 2024.

94.     On or about January 19, 2024, Plaintiff received a new Off-Scheduled Escrow Statement, which stated there was a surplus in escrow of $6.03 and, because it was under $50.00, it would remain in escrow and be applied to the March 2024 payment. The

statement stated the monthly mortgage payment would be $567.10 beginning with the April 2024 payment.

95. On or about February 8, 2024, Plaintiff made a payment of $567.47, which cleared his bank on February 13, 2024.

96. A week later, on or about February 21, 2024, Defendants sent Plaintiff a letter informing Plaintiff they had not received the February mortgage payment and that $836.67 was due, which included $269.20 in late charges. At the time Defendants sent this letter, Defendants knew or should have known that they had already received Plaintiff's payment as it cleared his bank account on February 13, 2024.

97. On March 10, 2024, Plaintiff made his Mortgage payment of $567.47, which cleared his bank account on March 15, 2024.

98. On or about March 15, 2024, Defendants sent Plaintiff his March monthly mortgage statement, which showed Plaintiff's payment, but still added late charges. The statement also showed that Defendants were continuing to demand $242.28 in unpaid late charges and holding $460.60 in unapplied payments.

99. Despite receipt of Plaintiff's Mortgage payment on March 15, 2024, on or about March 19, 2024, Defendants sent Plaintiff a letter claiming they had not received the monthly mortgage payment and that the total amount due on the account was $857.19, which included $269.12 in alleged unpaid late charges.

100. At the time Defendants sent this Mortgage statement to Plaintiff, Defendants knew or should have known that Plaintiff's Mortgage payment was not delinquent and it had in fact been received on March 15, 2024.

101. On or about April 9, 2024, Plaintiff received a letter from Defendants stating the account was in default and due for the March 1, 2024, payment.

102. On April 10, 2024, Plaintiff made his Mortgage payment of $567.10, which cleared his bank on April 15, 2024.

103. On May 9, 2024, Plaintiff made his Mortgage payment of $567.10, which cleared his bank on May 14, 2024.

104. On or about May 17, 2024, through Blackwell Agency, Plaintiff obtained new homeowners' insurance, with a policy period of 05/23/2024 to 05/23/2025.

105. On or about May 20, 2024, Plaintiff received a letter from Defendants claiming they had not received his monthly payment and that $917.06 was due, which included $349.96 of unpaid late charges. At the time Defendants sent this letter, Defendants had already received Plaintiff's payment.

106. On or about May 24, 2024, Plaintiff received a letter from Defendants stating their records showed Plaintiff's hazard insurance had expired and that they again planned to buy insurance for the property. Plaintiff immediately provided Defendants proof of his homeowner's insurance.

107. On or about May 29, 2024, Defendants sent Plaintiff a letter confirming receipt of Plaintiff's proof of insurance.

108. On or about June 26, 2024, Plaintiff obtained copies of his credit reports from Experian, Equifax, and TransUnion. To Plaintiff's dismay, all of his credit reports continued to inaccurately report the Mortgage with multiple late payments.

109. On or about June 26, 2024, Plaintiff mailed a fourth dispute letter to TransUnion

("**Fourth TransUnion Dispute**"), wherein he stated his TransUnion credit report continued to contain inaccurate information. Specifically, Plaintiff requested Defendant to remove the PHH Mortgage late pays for 2023 as Plaintiff's payments were all paid on time. TransUnion received Plaintiff's Fourth dispute letter on July 2, 2024, and thereafter forwarded same to Defendants.

110.   On or about June 26, 2024, Plaintiff mailed a fourth dispute letter to Experian (**"Fourth Experian Dispute"**), again disputing the PHH Mortgage reporting as 30 days late for 2023 and several months in 2024, as Plaintiff's payments were all paid on time. Experian received Plaintiff's Fourth dispute letter on July 1, 2024, and thereafter forwarded same to Defendants.

111.   On or about June 26, 2024, Plaintiff mailed a fourth dispute letter to Equifax (**"Fourth Equifax Dispute"**), again disputing the PHH Mortgage reporting as 30 days late for 2023 and several months in 2024 as Plaintiff's payments were all paid on time. Experian received Plaintiff's Fourth Dispute letter on July 1, 2024, and thereafter forwarded same to Defendants.

112.   On or about June 26, 2024, Plaintiff sent a third QWR to Defendants (**"Third QWR"**), wherein he again requested a complete payment history for the loan.  Plaintiff stated Defendants continued to force-place insurance on his home, although his home insurance had never been part of the escrow account on the Mortgage, and wrongfully bill him for the force-placed insurance.  Plaintiff stated he had sent proof of insurance to Defendants and Defendants confirmed receipt, but continued to add improper payments for escrow, which included the insurance, and to improperly assess late fees to his account.

As a result, Defendants began reporting him as 30-days late on his credit reports. Plaintiff requested Defendants immediately correct the matter and refund all charges for the force-placed insurance to his account above the $30 amount Defendants admitted is all that Plaintiff owed.

113.    Defendants never acknowledged receipt of Plaintiff's Third QWR, and to date, Defendants have never provided a response of any kind to Plaintiff's letter.

114.    As of the date of the filing of this Complaint, Defendants continue to report false, inaccurate information to the credit reporting agencies and to third parties which has harmed Plaintiff's reputation and caused him damages.

115.    Defendants repeatedly over-charged Plaintiff for insurance when Plaintiff only owed $30.00, an amount which Defendants admitted in writing to Plaintiff.

116.    As of the date of the filing of this Complaint, Defendants continue to wrongfully hold Plaintiff's timely monthly mortgage payments in suspense, place said payments in unapplied funds, and add additional interest and late payments to Plaintiff's Mortgage.

117.    From May 2023 through the present, Defendants have reported false, libelous, and defamatory information regarding the Plaintiff to the national credit bureaus and to numerous third parties. While Defendants were wrongfully reporting the Mortgage as late, said information was provided to and/or viewed by Granite Bay Acceptance, Bank of America, Syncb/Lowes, Syncb/Syncb, T-Mobile, Syncb/Amazon, IR/Tripoint Lending, Conn Appliances, Inc., Republic Finance, CNU Online CashnetUSA, Silverlake Financial, Regional Finance, IR/Lendwyse, LLC, Advance America, Credit9 Inc., Warehouse Home Furnishing Distributors, Comenity Bank/Comenity Capital, Finance Maryland, LLC,

Prime Equity Financial Corp, MBOCAL Inc., Verizon, Comenity Servicing LLC, LexisNexis/State Farm, Ally Credit Card/ACT, AT&T Services, Credit One Bank, Merrick Bank, W.S. Badcock, and others.

118.    Due to Defendants' actions, Plaintiff has suffered and continues to suffer harm to his credit and personal reputations.  Plaintiff has been denied credit, has endured ongoing efforts by Defendants to collect improper amounts on his Mortgage, continues to be billed by Defendants for improper late fees that Plaintiff does not owe, and has suffered harm to his reputation and credit reputation, lost sleep, worry, frustration, physical sickness including headaches, family discord, and loss of enjoyment of life.  Plaintiff has also lost a significant amount of time dealing with this matter with phone calls, writing numerous letters to Defendants and the credit reporting agencies, reviewing information received in response to said letters, and reviewing his monthly mortgage statements, for which he seeks damages.

## COUNT ONE
### (Fair Credit Reporting Act)

119.    The Plaintiff adopts the averments and allegations of paragraphs 17 through 118 hereinbefore as if fully set forth herein.

120.    The FCRA was created to protect consumers from the transmission of inaccurate information about them.  *Guimond v. Trans Union Credit Information Co., 45 F.3d 1329, 1333 (9th Cir. 1995).*

121.    Defendants are both furnishers under the FCRA and therefore, both are responsible for their obligations and duties under the FCRA.

122.  As the principal, Defendant NewRez controls all aspects of its agent's, Defendant PHH's, conduct in investigating disputes and reporting mortgages to the credit reporting agencies.  Therefore, Defendant NewRez has vicarious liability for all of Defendant PHH's FCRA violations.

123.  Defendants violated 15 U.S.C. §1681s-2(b) by failing to investigate the accuracy of the information reported by Defendants to the consumer reporting agencies.

124.  On at least one occasion within the past two years, by example only and without limitation, Defendants violated 15 U.S.C. §1681s-2(b)(1)(A) by failing to fully and properly investigate after receiving notice that the Plaintiff disputed the information said Defendants had provided to a consumer reporting agency.

125.  On at least one occasion within the past two years, by example only and without limitation, Defendants violated 15 U.S.C. §1681s-2(b)(1)(B) by failing to review all relevant information provided by the consumer reporting agencies.

126.  As a result of Defendants' violations of 15 U.S.C. §1681s-2(b)(1)(A) and (B), Plaintiff suffered actual damages, including but not limited to: damage to reputation and credit reputation, lost credit opportunities, credit denials, embarrassment, humiliation, frustration, anxiety, loss of sleep, worry, physical sickness, headaches, family discord, loss of enjoyment of life, lost time, and mental anguish.

127.  The law in this District, the Fourth Circuit, and even nationally has long ago been articulated to require a detailed and searching investigation by a furnisher when it receives a consumer's FCRA dispute through a consumer reporting agency.

128.  The violations by Defendants were willful, rendering them liable for punitive

damages in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n. In the alternative, Defendants were negligent, entitling the Plaintiff to recovery under 15 U.S.C. §1681o.

129.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorneys' fees from Defendants in an amount to be determined by a jury pursuant to 15 U.S.C. §1681n and §1681o.

**COUNT TWO**
**(Fair Credit Reporting Act)**

130.    The Plaintiff adopts the averments and allegations of paragraphs 17 through 129 hereinbefore as if fully set forth herein.

131.    As the principal, Defendant NewRez controls all aspects of its agent's, Defendant PHH's, conduct in investigating disputes and reporting mortgages to the credit reporting agencies. Therefore, Defendant NewRez has vicarious liability for all of Defendant PHH's FCRA violations.

132.    On one or more occasions within the past two years, by example only and without limitation, Defendants violated 15 U.S.C. §1681s-2(b)(1)(C) and (D) by publishing Defendants' inaccuracies within Plaintiff's credit files with the credit reporting agencies by failing to correctly report results of an accurate investigation to each credit reporting agency.

133.    Defendants violated 15 U.S.C. §1681s-2(b)(1)(C) by reporting inaccurate, incomplete, false, and misleading results of the investigation, if any, to at least one consumer reporting agency.

134. Defendants violated 15 U.S.C. §1681s-2(b)(1)(D) by failing to notify all consumer reporting agencies that the reporting of the Mortgage the subject of this action was inaccurate, incomplete, false, and misleading.

135. As a result of Defendants' violations of 15 U.S.C. §1681s-2(b)(1)(C) and (D), the Plaintiff suffered actual damages, including but not limited to: damage to his reputation and credit reputation, lost credit opportunities, credit denials, and incurred out of pocket losses. Additionally, Plaintiff suffered humiliation, embarrassment, anxiety, loss of sleep, frustration, worry, family discord, loss of enjoyment of life, lost time, physical sickness, headaches, and mental anguish.

136. The violations by Defendants were willful, rendering them liable for punitive damages in an amount to be determined by the jury pursuant to 15 U.S.C. §1681n. In the alternative, Defendants were negligent, entitling the Plaintiff to recovery under 15 U.S.C. §1681o.

137. The Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs, and attorneys' fees, pursuant to 15 U.S.C. §1681n and §1681o.

## COUNT THREE
**(South Carolina Unfair Trade Practices Act)**

138. The Plaintiff adopts the averments and allegations of paragraphs 17 through 137 hereinbefore as if fully set forth herein.

139. Defendant NewRez is a master servicer of mortgage loans throughout the United States and specifically in South Carolina. As of March 31, 2023, Defendant NewRez serviced a portfolio of 1,853,203 loans with an unpaid principal balance of $390 billion

and was the fifth largest non-bank loan servicer.

140.    Defendant PHH is a servicer of mortgage loans throughout the United States and specifically in South Carolina.  As of June 30, 2023, Defendant PHH serviced 58,959 loans representing a $6.5 billion,

141.    The activities of Defendants constitute "trade or commerce" as defined by the South Carolina Unfair Trade Practices act, S.C. Code Ann. §39-5-10, *et seq.*

142.    The actions of Defendants described above constitute unfair and deceptive acts and practices in the conduct of trade and commerce, as prohibited by the South Carolina Unfair Trade Practices Act, S.C. Code Ann. §39-5-10, *et seq.*, and are willful violations thereof.

143.    Defendants hold and service thousands of mortgages throughout South Carolina.

144.    The actions of Defendants have a real and substantial potential for repetition and affect the public interest.

145.    Defendants are alleged to have previously engaged in similar conduct in South Carolina in direct violation of both the SCUTPA, as well as the FCRA.  *See Hughes v. PHH Mortgage Corporation a/k/a PHH Mortgage Services, et al.,* 4:24-cv-00985-JD (D. S.C., Feb. 27, 2024).

146.    Plaintiff has suffered an ascertainable loss due to the unlawful actions of Defendants, entitling Plaintiff to recover actual damages in an amount to be proven at trial, treble of said actual damages, and an award of attorneys' fees and costs.  Specifically, Plaintiff has lost all of the mortgage payments he paid to Defendants from June 2022 through the present which Defendants failed to properly credit to the principal and interest on his Mortgage, all of the improper late fees that were added to the Plaintiff's Mortgage and paid from

Plaintiff's payments, all of the charges paid for the force-placed insurance over the $30.00 charge for the one week of coverage Defendants admitted was all that Plaintiff owed, and all of the additional interest which was added to Plaintiff's Mortgage as a result of Defendants actions.

147.    Defendants' use or employment of unfair or deceptive methods, acts, and practices caused Plaintiff to suffer substantial out of pocket damages for mortgage payments made to Defendants which were not properly credited to the principal and interest of his Mortgage, force-placed insurance payments which were charged to Plaintiff's escrow account and not timely and properly credited, late fees that were wrongfully added due to Defendants holding Plaintiff's payments in suspense and/or crediting the payments to escrow funds rather than to the principal and interest due on the mortgage.  Defendants' use or employment of unfair or deceptive methods, acts, and practices also caused Plaintiff to suffer harm to his reputation and credit reputation, worry, humiliation, fear, loss of sleep, anxiety, physical sickness, headaches, loss of enjoyment of life, family discord, and lost time.  Plaintiff seeks actual damages for all of these harms caused by Defendants.

148.    Defendants' use or employment of unfair or deceptive methods, acts, and practices was willful, wanton, and knowing.  Therefore, Plaintiff is entitled to an award of three (3) times the actual damages he sustained.  Plaintiff is also entitled to attorney's fees and costs.

### COUNT FOUR
**(Violations of RESPA and Regulation X, Failure to Respond to Borrow Inquiries)**
**12 U.S.C. § 2601, *et seq.* and 12 C.F.R. § 1024.1, *et seq.*,**
**12 U.S.C. §§ 2605(e), 2605(f), and 12 C.F.R. §§ 1024.35, 1024.36**

149.    The Plaintiff adopts the averments and allegations of paragraphs 17 through 148

hereinbefore as if fully set forth herein.

150. RESPA (12 U.S.C. § 2601, *et seq.*) is a federal consumer protection statute which, along with its implementing regulations, imposes certain duties on lenders and servicers related to the real estate settlement process and servicing of mortgage loans, and provides a framework for borrowers to obtain account information and to remedy servicing and account errors.

151. Regulation X (12 C.F.R. § 1024.1, *et seq.*), issued by the CFPB, is RESPA's implementing regulation. RESPA expressly authorizes the CFPB "to prescribe such rules and regulations, to make such interpretations, and to grant such reasonable exemptions for classes of transactions, as may be necessary to achieve the purposes of this chapter." *See* 12 U.S.C. § 2617(a).

152. RESPA prohibits loan servicers from failing to comply with CFPB regulations intended to carry out RESPA's consumer protection purposes, including Regulation X. *See* 12 U.S.C. § 2605(k)(1)(E).

153. Each of the Defendants is or was the "servicer" of Plaintiff's loan, as defined by RESPA and Regulation X, during a period relevant to Plaintiff's claims herein. *See* 12 U.S.C. §2605(i)(2); 12 C.F.R. § 1024.2.

154. Pursuant to 12 U.S.C. § 2605(e), loan servicers have a duty to respond to inquiries received from a borrower meeting the criteria of a QWR.

155. A QWR is defined as "written correspondence, other than notice on a payment coupon or other payment medium supplied by the servicer, that (i) includes, or otherwise enables the servicer to identify, the name and account of the borrower; and (ii) includes a

statement of the reasons for the belief of the borrower, to the extent applicable, that the account is in error or provides sufficient detail to the servicer regarding other information sought by the borrower." 12 U.S.C. § 2605(e)(1)(B).

156.    RESPA requires a servicer who receives a QWR to "provide a written response acknowledging receipt of the correspondence within 5 days (excluding legal public holidays, Saturdays, and Sundays) unless the action requested is taken within such period." 12 U.S.C. § 2605(e)(1)(A).

157.    In addition to providing written acknowledgment of receipt, within thirty (30) days of receipt of a QWR from a borrower, a servicer must also (i) conduct an investigation, (i) make any necessary corrections to the borrower's account and provide written notice of any such corrections, and (iii) provide a written explanation that includes the "information requested by the borrower or an explanation of why the information requested is unavailable or cannot be obtained by the servicer." *See* 12 U.S.C. § 2605(e)(2).

158.    Regulation X also details specific actions a loan servicer must take upon receipt of a request for information, including acknowledging receipt, conducting an investigation, correcting any errors identified by the borrower or otherwise discovered during the investigation, and provided the borrower with a written response and explanation. *See* 12 C.F.R. §§ 1024.35, 1024.36.

159.    For purposes of Regulation X, "[a] qualified written request that requests information relating to the servicing of the mortgage loan is a request for information for purposes of this section, and a servicer must comply with all requirements applicable to a request for information with respect to such qualified written request." 12 C.F.R. §

1024.36(a).

160.    Defendants acknowledged receipt of the First QWR, but failed to conduct an investigation or to provide Plaintiff with a written response to the QWR, in violation of 12 C.F.R. §§ 1024.35 and 1024.36, and 12 U.S.C. §§ 2605(e) and 2605(k).

161.    Defendants failed to even acknowledge receipt of the Second QWR. Furthermore, Defendants failed to conduct an investigation and provide Plaintiff with a written response to the Second QWR, in violation of 12 C.F.R. §§ 1024.35 and 1024.36, and 12 U.S.C. §§ 2605(e) and 2605(k).

162.    Defendants' failure to respond to Plaintiff's two QWRs has significant implications for Plaintiff, including impeding his ability to identify potential account or servicing errors, and to seek necessary corrective actions. This lack of transparency, and Defendants' failure to comply with these requirements, deprived Plaintiff of the opportunity to exercise his rights effectively.

163.    Specifically, Defendants' refusal to provide Plaintiff with critical account information allowing him to identify and seek correction of account errors, and their refusal to independently investigate Plaintiff's account to identify and correct errors in response to the QWRs, means that improper fees – and the interest accruing on the increased loan balance as a result of these fees – continued to accumulate on Plaintiff's account and caused additional harm on an ongoing basis.

164.    As a result of Defendants' actions, Plaintiff has suffered actual damages including but not limited to increased debt and financial burden resulting from improperly imposed fees, interest, and other charges added to his loan balance, and physical sickness and

emotional distress.

165.    Accordingly, Plaintiff is entitled to recover actual damages pursuant to 12 U.S.C. § 2605(f)(1), along with any attorneys' fees and costs incurred in connection with this action pursuant to 12 U.S.C. § 2605(f)(3). Plaintiff is also entitled to additional statutory damages of up to $2,000.00 per violation pursuant to 12 U.S.C. § 2605(f)(1)(B), as a result of Defendants' pattern and practice of noncompliance.

## COUNT FIVE
### (Defamation, Libel and Slander)

166.    The Plaintiff adopts the averments and allegations of paragraphs 17 through 165 hereinbefore as if fully set forth herein.

167.    Defendants willfully, wantonly, recklessly and/or maliciously published and communicated false and defamatory statements regarding Plaintiff to third parties and the public at large. Said statements harmed Plaintiff's reputation and credit reputation, and caused Plaintiff physical sickness, mental anguish and emotional distress.

168.    Said communications were false in that Plaintiff's mortgage payments were not paid 30-days late to Defendants beginning in March 2023.

169.    Said false and defamatory statements have harmed the reputation of Plaintiff and/or deterred third persons from associating with Plaintiff. Specifically, Defendants reported multiple months of Plaintiff's Mortgage payments as 30-days past due to the national credit reporting agencies so the Mortgage would appear as a derogatory account on Plaintiff's credit reports. Plaintiff's credit reports were viewed by numerous third parties as set out above and Plaintiff suffered harm as a result.

170.    Defendants communicated to third parties and the public at large false information concerning Plaintiff, disseminating and imputing false and misleading credit worthiness information concerning Plaintiff, including, but not limited to, reporting that Plaintiff's payments on the Mortgage were delinquent.

171.    At the time said communications were made, Defendants knew or should have known the falsity of the communications or recklessly disregarded the potential inaccuracy of the information, yet knowingly, willfully and maliciously communicated the falsity.

172.    As a result of Defendants' intentional communications to third parties of the false information, Plaintiff was caused to suffer injury to his reputation in the eyes of his community and the public at large, and was forced to endure false credit reporting of the Mortgage in spite of the fact that Plaintiff's Mortgage was not delinquent.

173.    As a proximate consequence of said defamation, libel and slander, Plaintiff was caused to have negative credit reports, to be held up to public ridicule or shame, to lose credit opportunities and be denied a credit limit increase, and made to suffer humiliation, anxiety, loss of sleep, anger, worry, physical sickness and headaches, family discord, loss of enjoyment of life, lost time, and mental anguish for which he claims compensatory and punitive damages.

### COUNT SIX
**(Breach of Contract)**

174.    The Plaintiff adopts the averments and allegations of paragraphs 17 through 173 hereinbefore as if fully set forth herein.

175.    The Plaintiff and Defendants are both parties to a Note and Mortgage contract.  The

Note and Mortgage govern what charges Defendants can and cannot assess against the Plaintiff. Defendants have repeatedly charged Plaintiff for force-placed insurance when Plaintiff already had insurance in place on the property and Defendants acknowledged notice of same. This is a breach of the terms of the Note and Mortgage.

176. The Note and Mortgage also govern how payments are to be applied. Defendants repeatedly misapplied Plaintiff's payments causing the account to be inaccurate and also causing Plaintiff to incur wrongful late fees.

177. Defendants have repeatedly violated the terms of the contact and have refused to perform without legal excuse.

178. The actions of Defendants constitute a breach of the aforementioned contract.

179. As a consequence of Defendants' breach of contract, Plaintiff has suffered actual damages that may be recovered by way of a judgment for the recovery of contract damages against Defendants.

## AMOUNT OF DAMAGES DEMANDED

WHEREFORE, PREMISES CONSIDERED, Plaintiff demands a judgment against Defendants for the following:

A. Actual and statutory damages from Defendants pursuant to 15 U.S.C. §1681n(a)(1)(A) and/or 15 U.S.C. §1681o(a)(1);

B. Punitive damages from Defendants pursuant to 15 U.S.C. §1681n(a)(2);

C. Costs and reasonable attorneys' fees from Defendants pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2);

D. Actual damages and attorneys' fees and costs due to Defendants' violations of the

South Carolina Unfair Trade Practices Act;

E.     Treble damages for Defendants' willful violations of the South Carolina Unfair Trade Practices Act;

F.     Actual damages pursuant to 12 U.S.C. § 2605(f)(1), along with any attorneys' fees and costs incurred in connection with this action pursuant to 12 U.S.C. § 2605(f)(3);

G.     Statutory damages of up to $2,000.00 per violation pursuant to 12 U.S.C. § 2605(f)(1)(B);

H.     Actual and punitive damages, where available, and attorneys' fees and costs, where available, for Defendants' violations of South Carolina common law; and

I.     For such other and further relief as the Court may deem just and proper.


                                        */s/ Penny Hays Cauley*
                                        Penny Hays Cauley, Fed.  ID No.  10323
                                        Attorney for Plaintiff

**OF COUNSEL:**
HAYS CAULEY, P.C.
1303 West Evans Street
Florence, SC 29501
(843) 665-1717
(843) 665-1718 Facsimile
phc917@hayscauley.com

**PLAINTIFF DEMANDS A TRIAL BY STRUCK JURY ON ALL COUNTS**

                                        */s/ Penny Hays Cauley*
                                        Of Counsel

**DEFENDANTS TO BE SERVED VIA CERTIFIED MAIL:**

PHH Mortgage Corporation
d/b/a PHH Mortgage Services
c/o Corporation Service Co – Registered Agent
508 Meeting Street
West Columbia, South Carolina 29169

NewRez LLC
c/o Corporation Service Company – Registered Agent
508 Meeting Street
West Columbia, South Carolina 29169